[Cite as *State v. Kochensparger*, 2016-Ohio-2870.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                        Court of Appeals Nos. E-14-132
                                                                              E-14-133
          Appellee                                                            E-14-134
                                                                              E-14-135
v.

                                                     Trial Court Nos. 2012-CR-480
Jonathon Kochensparger                                                 2013-CR-052
                                                                       2013-CR-094
          Appellant                                                    2013-CR-249

                                                     <u>**DECISION AND JUDGMENT**</u>

                                                     Decided:  May 6, 2016

                                             * * * * *

          Kevin J. Baxter, Erie County Prosecuting Attorney, and
          Mary Ann Barylski, Chief Assistant Prosecutor, for appellee.

          Matthew H. Kishman, for appellant.

                                             * * * * *

**YARBROUGH, J.**

## I.  Introduction

**{¶ 1}** Appellant, Jonathon Kochensparger, appeals the judgment of the Erie

County Court of Common Pleas, convicting appellant of felonious assault, a felony of the

second degree, endangering children, a felony of the second degree, two counts of possession of heroin, felonies of the fifth degree, complicity to commit possession of heroin, a felony of the fifth degree, and possession of drugs, a misdemeanor of the first degree. For the following reasons, we affirm.

## A. Facts and Procedural Background

{¶ 2} On December 12, 2012, an Erie County Grand Jury indicted appellant on one count each of felonious assault pursuant to R.C. 2903.11(A)(1), and endangering children pursuant to R.C. 2919.22(B)(1) and (E)(2)(d), both being felonies of the second degree. The charges arose from an incident that occurred on October 12, 2012, when appellant and his wife, Kristin Kochensparger ("Kristin"), were living at a homeless shelter with Kristin's four children. One of the children, O.P., the victim in the case, was three months old at the time. Kristin left for work that morning around 5:30 a.m., leaving appellant in charge of the children, including O.P. When Kristin returned home that afternoon around 4:00 p.m., she noticed that O.P. was acting unusually lethargic. Kristin observed blood in O.P.'s diaper and O.P. began to vomit profusely during a feeding. At that time, Kristin took O.P. to the hospital where a CAT scan revealed bleeding on O.P.'s brain.

{¶ 3} Five days later, an employee at the homeless shelter conducted an inspection of appellant's room. During this inspection, the employee recovered a bucket containing a man's trimmer, scissors, a spoon with residue, and a syringe. Trace amounts of heroin were found on the spoon and the syringe. An Erie County Grand Jury indicted appellant

2.

for possession of heroin, in violation of R.C. 2925.11(A) and (C)(6)(a), a felony of the fifth degree, on February 7, 2013.

{¶ 4} On November 1, 2012, appellant's parole officer located appellant at 527 Pearl Street, where he had been staying with friends, Joshua and Nicole Hamm. Also located in the kitchen of that residence was various drug paraphernalia, including spoons with heroin residue and syringes. Appellant admitted recent heroin use to his parole officer. On that day, authorities searched appellant's vehicle and found a pill crusher with heroin residue, a scale, a pill bottle, and a spoon. Consequently, appellant was indicted on January 23, 2013, for complicity to commit possession of heroin, in violation of R.C. 2923.02(A)(2), a felony of the fifth degree.

{¶ 5} The state filed a motion for joinder of the three cases for trial purposes on May 2, 2013. Appellant filed a memorandum in opposition of joinder on May 23, 2013. In his judgment entry granting the state's motion for joinder, the court found that 1) the two cases involving heroin were similar in nature, 2) the case involving felonious assault and child endangering involves evidence that is simple and direct so that a jury would not be confused, and 3) appellant did not demonstrate that he would be prejudiced by consolidating the three cases into one trial.

{¶ 6} On June 12, 2013, the state brought a fourth indictment against appellant for possession of heroin, in violation of R.C. 2925.11(A) and (C)(6)(a), a felony of the fifth degree, and possession of drugs, in violation of R.C. 2925.11(A) and (C)(2)(a), a misdemeanor of the first degree. This indictment relates to the evidence found in

3.

appellant's car on November 1, 2012. The state filed a separate motion for joinder of this case on May 19, 2014. This motion was granted, without objection. After several other pretrial issues, trial began for these matters on September 30, 2014, and spanned several, partial days, concluding on October 9, 2014.

{¶ 7} For its first witness, the state called Kristin, the mother of O.P. She testified that she was present in the parking garage at the hospital when appellant told a detective that he shook the baby and tossed him on the bed. She further testified that she initially did not believe appellant's confession, however appellant's nonchalant attitude in the following days led her to question whether or not he was actually telling the truth.

{¶ 8} The state next called Joshua Hamm to testify. Hamm revealed to the court that his friendship with appellant was "drug related." Specifically, he stated "[Appellant] would come to me to get, you know, drugs. I'd help him out." The two were arrested together as a result of the November 1, 2012 search, resulting in heroin related charges for both appellant and Hamm. Subsequently, the two became cellmates in the Erie County Jail. Hamm stated that while incarcerated, appellant discussed the incident involving O.P. with him. Specifically, Hamm testified that appellant told Hamm that on the day of O.P.'s hospitalization, appellant was "dope sick." Hamm described the concept of "dope sick" as, "after, you know, a certain amount of time you haven't, from your last shot of heroin, snort of heroin or whatever, you start to get really sick if you can't feed that fix. It's like having the flu but a hundred times worse, you know. You're really restless, nauseated, you know, diarrhea, cold sweats, um every ounce of your body

4.

aches really bad, very irritable." Hamm went on to say that appellant confessed to him that the baby would not stop crying, so he threw a pillow at the baby. When this did not work, appellant stated that he grabbed the baby and shook it, in an attempt to get it to shut up.

{¶ 9} Hamm testified that at some point on the first day at the jail, he was approached by Detective Nixon, of the Sandusky Police Department, who asked if Hamm had any information regarding the injuries to O.P. Hamm responded that he did not. Subsequently, after the discussion with appellant regarding O.P., Hamm again saw Nixon at the jail and this time, Hamm initiated a conversation. He told Nixon what appellant had told him regarding O.P.'s injuries. He further told Nixon that he was not looking for a deal in return for his statement. Hamm clarified at the trial that he was not receiving any deal in exchange for his testimony and although he was initially angry with appellant for his arrest, he since came to be thankful that he was arrested and that it gave him the opportunity to turn his life around.

{¶ 10} Terry K., a resident of the shelter on October 12, 2012, then testified that appellant initiated a conversation with him on that day. He stated that the main topic of conversation was how burdensome O.P. was to him and that he was very frustrated that he just could not get O.P. to shut up.

{¶ 11} Detective Nixon then testified that he spoke with appellant and Kristin at the hospital the day after the injury. He spoke with appellant in a private room in the hospital to get an idea of what happened. Appellant told him that O.P. had thrown up and

5.

was not acting like himself. He denied shaking, dropping or striking O.P. Nixon again spoke with appellant in the parking garage of the hospital. During this conversation, appellant initially denied hitting, dropping, or shaking O.P. At some point during this conversation, appellant changed his tone, stating that he saw one of the other kids slam O.P. in the bouncy seat. Nixon confronted appellant with the fact that he had changed his story and appellant then stated "fine, I threw him on the bed accidentally." Nixon further corroborated Hamm's testimony that Hamm had approached him at the jail and explicitly stated that he did not want any deals in exchange for his cooperation.

{¶ 12} The state then solicited expert medical testimony from Dr. Lolita McDavid. Dr. McDavid testified, to a reasonable degree of medical certainty, that O.P.'s injuries were caused by non-accidental trauma with shake mechanism. As a result of the trauma, O.P. suffered subdural and subarachnoid hematomas and multiple retinal hemorrhages in his left eye.

{¶ 13} Several police officers were then called to testify. The officers testified to the search of Hamm's residence on November 1, 2012. At the time of the search, appellant was living at Hamm's residence with Hamm and Hamm's wife. Heroin and drug paraphernalia were found in the common areas of the home, and in Hamm's personal belongings. The officers also testified to the chain of custody regarding preservation of the evidence, as well as chemical test results regarding the narcotics.

{¶ 14} Finally, the state solicited testimony from appellant's parole officer and her partner. They testified that when appellant was located at Hamm's residence on

6.

November 1, 2012, they spoke with appellant. Appellant spoke with them and stated that if he were to be drug tested, he would be positive for heroin. The parole officer went on to testify that she searched appellant's car, which was parked outside of Hamm's residence, and located additional narcotics and drug paraphernalia.

{¶ 15} In his defense, appellant first solicited testimony from J.P., O.P.'s nine-year-old sister. J.P. testified that while her mother was at work, appellant took care of her and her siblings. She admitted that she was not always in the same room as appellant. However, she stated that she never saw appellant drop, strike, or get mad at O.P. She could only recall one incident during the time appellant stayed at the shelter in which appellant became visibly angry.

{¶ 16} Appellant next called Brittany H., another resident of the shelter. She testified that she lived across the hall from appellant from April through December 2012. She could not recall if she was present at the shelter during the day of October 12, 2012. She would usually take her kids out for the day to get them away from the shelter. She did state that when she was there, appellant appeared to be attentive to the children and she never heard or saw him be physically or verbally abusive to any of the children.

{¶ 17} Appellant concluded his defense by calling Dr. John Galaznik. Ultimately, Dr. Galaznik testified to a reasonable degree of medical certainty that non-abusive explanations were the reason for O.P.'s illness. He opined that O.P. suffered from cortical vein thrombosis.

7.

{¶ 18} The state then called Dr. Randall Schlievert as a rebuttal witness.  Dr. Schlievert testified that O.P.'s injuries could not have been caused by cortical vein thrombosis.  He opined to a reasonable degree of medical certainty that O.P. was the victim of non-accidental, abusive head trauma.

{¶ 19} After deliberating, a jury found appellant guilty on all counts.  His timely consolidated appeal followed.

### B.  Assignments of Error

{¶ 20} On appeal, appellant assigns the following errors for our review:

1) Appellant was deprived of his right to effective assistance of counsel when his trial counsel failed to properly move to sever his drug-related charges from the charges involving abusing a child.

2) The guilty verdicts for felonious assault, endangering children, and complicity to commit possession of heroin are against the manifest weight of the evidence in violation of appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio State Constitution.

3) Appellant was deprived of his right to cross-examine witnesses against him in violation of the Fourteenth and Sixth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio State Constitution when the trial court allowed the State to introduce medical reports into evidence without requiring their authors to testify.

8.

## II. Analysis

### Ineffective Assistance of Counsel

{¶ 21} In his first assignment of error, appellant asserts that he was deprived of his right to effective assistance of counsel. Specifically, appellant argues that his trial counsel was ineffective for failing to renew his motion to sever the indictments for trial purposes at the close of appellee's case in chief. We disagree.

{¶ 22} In order to prove ineffective assistance of counsel, appellant must show defense counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the results of the trial would have been different. *Strickland v. Washington*, 466 U.S. 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Ohio, a properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel." *State v. Campbell*, 6th Dist. Lucas No. L-05-1284, 2006-Ohio-4435, ¶ 20, citing *State v. Phillips*, 74 Ohio St.3d 72, 85-88, 656 N.E.2d 643 (1995).

{¶ 23} As noted above, the state filed a pretrial motion for joinder of the indictments for trial purposes. Appellant objected to the motion, arguing that the evidence presented at trial for the separate cases would not be simple and direct, would be highly prejudicial to appellant, and the Ohio Rules of Criminal Procedure do not provide a basis for joinder. The court granted the motion, reasoning that the evidence to

9.

be presented would be simple and direct, and that appellant had failed to make a showing of any prejudice.

{¶ 24} Crim.R. 13 authorizes the joinder of two or more indictments for a single trial. Crim.R. 14 provides, however, that separate trials shall be ordered if it appears that a defendant is prejudiced by joinder for trial of indictments. The burden of demonstrating prejudice under Crim.R. 14 is on the defendant. *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. A claim of prejudice depends on whether the salient advantages of joinder and avoidance of multiple trials are outweighed by the right of a defendant to be tried fairly on each charge. *Id.* at 343, 421 N.E.2d 1288.

{¶ 25} The state can defeat a claim of prejudice under Crim.R. 14 using either the "other acts" test, or the "joinder" test. Under the "other acts" test, the state must show that pursuant to Evid.R. 404(B), evidence of the other charged offenses would be admissible even if the counts or indictments had been severed for trial. The "joinder" test merely requires the state to show that evidence of each crime joined at trial is simple and direct. When the state shows that the evidence of each crime is simple and direct, it is not required to meet the stricter "other acts" admissibility test. *See State v. Lott*, 51 Ohio St.3d 160, 163-164, 555 N.E.2d 293 (1990); *State v. Hicks*, 6th Dist. Nos. L-04-1021, L-04-1022, 2005-Ohio-6848, ¶ 30, 41.

{¶ 26} In the present case, appellant is not arguing that his attorney was ineffective for failing to object to the joinder of his separate cases, but rather his ineffectiveness stemmed from his failure to renew his objection at the close of the state's case in chief.

10.

In order for this argument to succeed, appellant would need to show that he was prejudiced by this action. He has not made such a showing.

{¶ 27} Counsel is not required to do a futile act. *See State v. Martin*, 20 Ohio App.3d 172, 174, 485 N.E.2d 717 (1st Dist.1983); *State v. Moorman*, 7 Ohio App.3d 251, 253, 455 N.E.2d 495 (1st Dist.1982); *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). It is clear from the record in this case that appellant, in his initial opposition to joinder, argued that the evidence would not be simple and direct. He noted the existence of detailed medical evidence and expert witness testimony. He explained that the evidence to be presented would be highly inflammatory and could prejudice appellant in that regard. He argued that a jury would use that highly inflammatory evidence, of shaking a child or using narcotics, to convict him of the unrelated charges. It is fair to say that at that point, the court was aware of the nature of the evidence that was to be presented. Taking that into consideration, the court determined that joinder was proper.

{¶ 28} There is nothing in the record to indicate that the evidence presented at trial was significantly different from what was purported to be the evidence when the motion for joinder was initially argued. Therefore, renewing the objection to joinder of the cases would have been futile, as the court would likely have denied the motion again. Because appellant cannot show that the motion would have been granted, appellant cannot show that the outcome would have been different had the objection been renewed.

11.

{¶ 29} Because of the foregoing, appellant has not met the threshold for ineffective assistance of counsel set forth in *Strickland*. Appellant's first assignment of error is therefore not well-taken.

## Manifest Weight

{¶ 30} In his second assignment of error, appellant argues that his convictions for felonious assault, child endangering and complicity to commit possession of heroin are against the manifest weight of the evidence. When reviewing a manifest weight claim,

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 31} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id*. It has been long held that the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to decide. *State v. Thomas*, 70 Ohio St.2d 79, 79-80, 434 N.E.2d 1356 (1982). The standard of review is therefore high, and the trial court, with its unique position to resolve the factual issues, enjoys significant deference to determine the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992).

12.

{¶ 32} Pertaining to the felonious assault and child endangering convictions, appellant's manifest weight argument is twofold. He first argues that there was insufficient evidence to support the finding that O.P.'s injuries were intentionally inflicted. We disagree.

{¶ 33} The state solicited testimony from two medical experts: Dr. Lolita McDavid, and Dr. Randall Schlievert. Dr. McDavid is the medical director of child advocacy and protection at the Rainbow Hospital in Cleveland, Ohio. She testified to a reasonable degree of medical certainty that O.P. suffered non-accidental injuries consistent with shaking. Likewise, Dr. Schlievert, director of Mercy Health's child abuse program in Toledo, Ohio, testified that O.P.'s injuries were a result of abusive head trauma. By looking at the specific nature of the damage sustained by O.P., Dr. Schlievert was able to rule out any non-accidental conditions that would lead to O.P.'s condition.

{¶ 34} After hearing all of the testimony, including testimony from Dr. Galaznik, who testified as a medical expert on behalf of appellant, a jury concluded that O.P.'s injuries were intentionally inflicted. This conclusion is supported by sufficient evidence. The jury, in its unique position to determine the credibility of witnesses, determined that the state's expert witnesses were more credible than the expert witness presented by the appellant. This determination is not against the manifest weight of the evidence.

{¶ 35} Appellant next argues that even if the state was able to show that O.P.'s injuries were intentionally inflicted, there is no reliable evidence that appellant was the cause of the harm. We disagree.

13.

{¶ 36} Appellant argues that the only person to offer testimony establishing him as the cause of O.P.'s injuries was Joshua Hamm. Appellant paints Hamm as a disgruntled former friend who blames appellant for his own arrest. A review of the record demonstrates that this is simply not accurate. Although no one saw appellant injure the child, several witnesses testified to circumstantial evidence that could convince a jury that appellant was the cause of the injuries. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 37} It is undisputed that appellant was the sole caregiver for O.P. on the day in question. Appellant's wife testified that when she left for work on the morning of October 12, 2012, O.P. had been acting normal and showed no signs of any injuries. When she returned home, appellant left and she immediately noticed that O.P. was not acting like himself. O.P. was vomiting and had blood in his diaper. She recalled that appellant displayed a nonchalant attitude toward O.P. and questioned whether an admission by appellant, made to a detective was truthful.

{¶ 38} Detective Nixon testified that appellant told him several stories about what happened. First, appellant told him that nothing had happened that day to cause any injuries. Appellant then stated that he saw the other kids playing rough with O.P. in the bouncy seat and that could have caused the injuries. Appellant, upon threat of having the children taken from their mother, then stated that he had accidentally thrown O.P. on the bed.

14.

**{¶ 39}** Hamm testified that appellant confessed to shaking O.P. on October 12. Appellant confessed to him that he had been "dope sick" and could not get the baby to stop crying. He confessed that he threw a pillow at O.P. while he was in the car seat, and then picked him up and shook him. Although appellant argues that this testimony is not reliable, Hamm testified that he was no longer upset about his arrest and that he did not receive, nor want, any deal in exchange for his testimony. Two individuals living at the shelter corroborated this testimony by testifying that appellant was complaining that O.P. would not stop crying on October 12, 2012.

**{¶ 40}** After hearing all of the evidence, a jury made the determination that O.P.'s injuries were intentionally inflicted by appellant. In reviewing the entire record, we cannot say that determination was against the manifest weight of the evidence.

**{¶ 41}** Appellant also argues that his conviction for conspiracy to commit possession of drugs was against the manifest weight of the evidence. His argument relies on R.C. 2925.01(K) which reads, "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." This argument is unpersuasive.

**{¶ 42}** Under the principle of complicity or accomplice liability, an individual may be found guilty if he solicits, aids, abets or conspires with another individual to commit an offense and shares the criminal intent of an individual who commits the principal offense. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. The

15.

mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *Id.,* citing *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission. *Johnson* at 243.

{¶ 43} The record indicates that appellant was more than "merely present" when a crime was committed. Hamm testified that appellant had been living with him for approximately one week before the search of the home. Hamm stated that his relationship with appellant was a "drug related" relationship, and that he and appellant had used heroin at his home. Drug residue and paraphernalia were found in appellant's car at the time of the search, and appellant admitted that, if tested, he would be positive for heroin.

{¶ 44} We cannot say that appellant's conviction for complicity to commit possession of drugs is against the manifest weight of the evidence. Appellant's second assignment of error is not well-taken.

### Right to Cross-Examine

{¶ 45} In appellant's third assignment of error, he argues that the trial court improperly allowed the state to introduce medical reports into evidence without requiring their authors to testify. For the following reasons, we disagree.

{¶ 46} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the

right * * * to be confronted with the witnesses against him * * *." The United States Supreme Court has interpreted this language to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is "testimonial" unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Although *Crawford* did not define the term "testimonial statement," the term has subsequently been defined as a statement made for the "primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011).

{¶ 47} In determining whether the medical records in the current case are testimonial, we must first determine the primary purpose of their creation. Appellant argues that the primary purpose of these documents was for use in Dr. McDavid's report. In support of this argument, appellant cites to *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930. *Maxwell* was decided by the Ohio Supreme Court in 2014, and clarified the "primary purpose test." *Maxwell* held that "[a] key element in evaluating the admissibility of the coroner's testimony and the autopsy report in light of the recent United States Supreme Court cases is the primary-purpose test, which examines the reasons for and purpose of the record in question. To determine the primary purpose, a court must "objectively evaluat[e] the statements and actions of the parties to the encounter' giving rise to the statements." *Id*. at ¶ 49, citing *Bryant* at 1162.

17.

**{¶ 48}** In the case at bar, O.P. was taken to the hospital for vomiting, lethargy, and blood in his diaper. The doctors performed an MRI which determined there was bleeding on his brain. At that point, O.P. was seen by several other doctors who performed tests and memorialized their findings in the form of notes. Appellant argues that much of this, including the MRI, a skeletal survey and notes from a neurologist, ophthalmologist, and pediatric emergency doctors, were done for the primary purpose of securing their ability at a later prosecution. This argument is not persuasive.

**{¶ 49}** An objective evaluation of the tests that were conducted and the reports that were generated, show that they were done for the primary purpose of evaluating O.P.'s injuries and creating a treatment plan going forward. Consequently, the medical records referenced by Dr. McDavid were not testimonial and the admission of such records at trial did not violate appellant's right to cross-examine witnesses against him.

**{¶ 50}** Therefore, appellant's third assignment of error is not well-taken.

### III. Conclusion

**{¶ 51}** Based on the foregoing, the judgment of the Erie County Court of Common Pleas is affirmed. Costs are hereby assessed to appellant in accordance with App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

_____
JUDGE

Stephen A. Yarbrough, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.